ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL VI

| | | |
|---|---|---|
| DEPARTAMENTO DE EDUCACIÓN<br><br>Recurrido<br><br>v.<br><br>ASOCIACIÓN DE MAESTROS DE PUERTO RICO-LOCAL SINDICAL Y OTROS<br><br>Peticionario | KLCE202400489 | *Apelación* procedente del Tribunal de Primera Instancia, Sala de San Juan<br><br>Civil Núm.: SJ2022CV02741<br><br>Sobre: Revisión de Laudo de Arbitraje |

Panel integrado por su presidenta, la Jueza Ortiz Flores, el Juez Rivera Torres, la Juez Rivera Pérez y el Juez Campos Pérez

Campos Pérez, Juez Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 29 de mayo de 2024.

Comparece la parte peticionaria, Asociación de Maestros de Puerto Rico - Local Sindical (AMPR-LS), en representación del Sr. William C. Saurí Rivera (señor Saurí Rivera). Solicita la revocación de la *Sentencia* emitida el 2 de abril de 2024, notificada al día siguiente, por el Tribunal de Primera Instancia, Sala de San Juan (TPI). En el referido dictamen, el TPI declaró con lugar la *Revisión Judicial del Laudo de Arbitraje* presentada por la parte recurrida, el Estado Libre Asociado de Puerto Rico, por conducto del Departamento de Educación (Departamento). En consecuencia, revocó el *Laudo de Arbitraje* impugnado y reinstaló la sanción de suspensión de empleo y sueldo de 120 días, impuesta al señor Saurí Rivera.

Ponderadas las alegaciones de la parte peticionaria y el derecho aplicable, eximimos a la parte recurrida de presentar su alegato, por virtud de la Regla 7 (B)(5) del Reglamento del Tribunal de Apelaciones, 4 LPRA Ap. XXII–B, R. 7 (B)(5). Al amparo de la

norma procesal, este foro revisor tiene la facultad para prescindir de escritos en cualquier caso ante su consideración, con el propósito de lograr su más justo y eficiente despacho. Anticipamos, pues, la expedición del recurso de *certiorari* y la modificación de la determinación judicial, a los efectos de decretar la destitución del peticionario de su puesto como maestro de Educación Física a nivel secundario y la revocación de sus certificaciones como empleado del recurrido.

**I.**

La presente causa se inició el 24 de julio de 2017, cuando el Departamento cursó una carta de intención de formulación de cargos contra el señor Saurí Rivera, por hechos acontecidos en el primer semestre escolar de 2016, según surge de los autos.[1] Luego de observar los procedimientos de vista administrativa informal, el 14 de diciembre de 2018, el Departamento imputó ocho cargos contra el peticionario por haber incurrido "en **conducta inmoral y lesiva al buen nombre del Departamento de Educación en el desempeño de las funciones** en su puesto permanente R85135, de maestro de Educación Física[,] nivel secundario en la escuela Francisco Gaztambide Vega del distrito escolar de Bayamón".[2] (Énfasis nuestro). Al concluir que el señor Saurí Rivera transgredió varias disposiciones legales y reglamentarias, lo suspendió de empleo y sueldo de su puesto por un periodo de 120 días.

Reproducimos los cargos aludidos, a los que le hemos impartido énfasis:[3]

1. Le contaba sus intimidades con la señora Escobar (Lixia Escobar) a la estudiante Zuleika M. Pérez Oliveras, quien comenzó a tomar la clase de Educación Física con usted desde agosto de 2016 debido a que le faltaban unos requisitos de graduación. En una ocasión, le dijo que la señora Escobar se tragaba la leche. En otra ocasión, la

---

[1] Apéndice, págs. 154-162.
[2] Apéndice, págs. 1-10.
[3] Al presente, las jóvenes han advenido a la mayoría de edad.

estudiante fue a tomar un examen y usted le indicó que le quería someter esto, refiriéndose a su mano "coja" en forma "pervertida" (depravada). La estudiante le indicó que no quería que le hablara así a lo que usted indicó que ella sabía que era relajando. Por lo anteriormente expuesto, la estudiante dejó de asistir a la clase, ya que se sentía incómoda.

2. Comenzó a preguntarle a la estudiante Angélica del Castillo Moya, si era "indiecita", ya que una maestra le hablaba de ella de forma despectiva y le decía a usted que ella era una "cochofle", "puta" y que enamoraba a los nenes y los dejaba. Le contaba de sus intimidades con la señora Escobar (Lixia Escobar), como que ella se tragaba su semen y que le compraba vibradores en "Wish".

   También le decía que cuando cumpliera los dieciocho (18) años, implicando que podía estar con él. Lo anterior de forma pervertida. Le decía, además, que cada vez que iba en mahon[e]s era inevitable no ligarla y una vez le indicó que si se ponía la camisa con el pantalón corto se veía mejor. Le contaba que el esposo de la señora Escobar se "meaba" en la cama.

3. Dice palabras obscenas en la sala de clases, tales como: "cabrón", "pendejos", "me cago en la madre al que no juegue", "mierda", "puñeta" y "carajo".

4. Por los hechos antes expuestos, se radicaron en su contra las órdenes de protección SBPM-2017-48 (Ex Parte, peticionada por la Sra. Marilyn Oliveras a favor de su hija Zuleika M. Pérez Oliveras), la cual fue expedida desde el 8 de febrero de 2017, hasta el 7 de marzo de 2017 y posteriormente, fue extendida hasta el 10 de abril de 2017 y la SBPM-17-49, peticionada por la Sra., Jacqueline Moya Estrella, en representación de su hija Angélica del Castillo Moya, la cual fue expedida desde el 8 de febrero de 2017 hasta el 7 de marzo de 2017, posteriormente, fue extendida hasta el 10 de abril de 2017.

5. **Durante los meses de septiembre a diciembre de 2014, usted realizó comentarios a la estudiante Alejandra A. Torres Pérez, tales como: que un día fuera para su casa por la noche y que con esa pose hubiese sido bueno tener el celular afuera y tirarle una foto. En otra ocasión, en que ella corrió a buscar una bola, usted le dijo: "corre, así mismo, que se te mueve todo, así te quiero ver".**

6. **El 13 de noviembre de 2014, ella le preguntó por la localización de una práctica de *volleyball*, a lo que usted respondió que ella no sabría, ya que no había ningún motel cerca.**

7. **En otra ocasión, le preguntó a la estudiante qué edad tenía, luego de contestarle le comentó que era menor de edad todavía, le tocó el hombro y le**

**dijo que como era flaca usted la aguantaría fácil. Usted le acercó el rostro y esta lo evitó. Usted le preguntó por qué se echó para atrás.**

8. En otra ocasión, en que Alejandra estaba presente, un estudiante le dijo que estaba bueno el juego y usted le comentó: "No, estaría mejor si ella estuviera al frente mío para poder mirar lo buena que está". Lo anterior, refiriéndose a Alejandra y la tomó por el brazo para colocarla frente a usted, por lo que [é]sta se incomodó.

Inconforme, el 16 de enero de 2019, en representación del señor Sauri Rivera, la AMPR-LS instó una *Solicitud de Arbitraje de Quejas y Agravios* ante la Comisión Apelativa del Servicio Público (CASP).[4] Peticionó que se dejara sin efecto la suspensión de empleo y sueldo y la restitución de todos los salarios, derechos y deberes del peticionario.

Las partes no concurrieron en un acuerdo de sumisión. Por consiguiente, la Árbitra Beatrice Ríos Ramírez de la CASP determinó la siguiente controversia a dirimir:

Determinar, conforme a los hechos del caso, la prueba presentada en evidencia, el Convenio Colectivo y el derecho aplicable si la medida disciplinaria impuesta por la AGENCIA al QUERELLANTE William C. Saurí Rivera de suspensión de empleo y sueldo estuvo o no justificada. De determinar que estuvo justificada, desestimar la querella. De determinar que no fue conforme a derecho, determinar el remedio más adecuado que en derecho proceda.

La vista administrativa se celebró los días 18 de marzo de 2021 y 12 de abril de 2021. Evaluada la prueba documental y testifical desfilada, la Árbitra dictó el *Laudo de Arbitraje* el 9 de marzo de 2022.[5] Justipreció que los cargos 1, 2, 3 y 4 no se probaron, ya que el Departamento ofreció prueba de referencia[6] y, a

---

[4] Apéndice, págs. 11-12.
[5] Apéndice, págs. 62-81.
[6] En alusión a las declaraciones de dos testigos del Departamento, a saber: la trabajadora social, Sra. Gerlyn Serrano Cruet, y la investigadora, Sra. Daphne Rivera Barreto. Al respecto, expresó la juzgadora de hechos: "Señalamos que de haber declarado las otras estudiantes mencionadas en los cargos y que no acudieron a testificar ante esta Árbitra hubieran declarado parecido a lo que declarado [*sic*] por la señora Torres [Pérez] con relación a los cargos 1, 2, 3, 4 y 8 en el sentido de que el QUERELLANTE hizo unos comentarios fuera de lugar en presencia de las menores". Véase, Apéndice, pág. 77.

su vez, la AMPR-LS refutó la evidencia vertida.[7] En cuanto al cargo 8, la Árbitra indicó que, aun cuando el testimonio de la joven Alejandra Torres Pérez constituyó prueba testifical directa, con personal y propio conocimiento, ésta no declaró sobre los hechos alegados en el referido cargo. Ahora, toda vez que confirió "total y entera credibilidad" al testimonio de la exestudiante Torres Pérez, halló probados los cargos 5, 6 y 7.

Al dirimir la idoneidad de la sanción disciplinaria impuesta al señor Saurí Rivera, la Árbitra Ríos Ramírez aplicó únicamente el hoy derogado, pero vigente a los hechos, Reglamento Núm. 7565, *Reglamento de Medidas Correctivas y Acciones Disciplinarias*, de 8 de septiembre de 2008.[8] En específico, aludió a la ofensa 5, *Conducta Desordenada o Creación de Disturbios*. Entonces, a tenor de la reglamentación, modificó la medida disciplinaria a una amonestación escrita.

Insatisfecho, el 8 de abril de 2022, el Departamento instó una *Revisión Judicial del Laudo de Arbitraje*, para impugnar el pronunciamiento arbitral.[9] La AMPR-LS se opuso.[10] Evaluados los planteamientos de los contendientes, el TPI determinó probados los siguientes hechos, a los que suplimos énfasis:

1. Saurí Rivera labora como maestro de educación física, nivel secundario, puesto permanente R85135, en la Escuela Francisco Gaztambide Vega, distrito escolar de Bayamón.

2. **A Saurí Rivera se le imputó incurrir en conducta inmoral y lesiva al buen nombre del Departamento de Educación en el desempeño de sus funciones como maestro a nivel secundario**.

---

[7] Refiérase a la *Resolución* de 15 de agosto de 2017, que archiva la orden de protección interpuesta por la señora Jackeline Moya Estrella, en representación de su hija, Angélica del Castillo Moya; véase, Apéndice, págs. 23; 241-243. Además, *Notificación sobre resultado de investigación de maltrato* del Departamento de la Familia de 2017, que determinó que no había fundamento de maltrato emocional a Zuleika Pérez Oliveras y a Angélica del Castillo Moya en el Referido 10070538; véase, Apéndice, págs. 24-26; 223-226; 251-262. Obra en autos también una determinación infundada de maltrato emocional a A.M.S. [*sic*] en los referidos R14-03-11710 y R14-11-57765 de 2014; véase, *Notificación sobre resultado de investigación de maltrato* en el Apéndice, págs. 27-28.

[8] Apéndice, págs. 471-512.

[9] Apéndice, págs. 82-512.

[10] Apéndice, págs. 513-537.

3. El 24 de julio de 201[7], Saurí Rivera recibió una carta de intención de imposición de medida disciplinaria de suspensión o destitución de su puesto. En la misma se le apercibió de su derecho a solicitar celebración de una vista administrativa informal. Asimismo, Saurí Rivera fue suspendido sumariamente de empleo, sin privación de sueldo, efectivo al recibo de la comunicación.

4. Saurí Rivera ejerció su derecho y solicitó la celebración de una vista administrativa informal. La vista administrativa informal se celebró el 24 de octubre de 2018.

5. Con fecha del 14 de diciembre de 2018 y notificada el 20 de diciembre de 2018, la entonces secretaria del Departamento de Educación, la Dra. Julia B. Keleher, impuso como medida disciplinaria una suspensión de empleo y sueldo de ciento veinte (120) días laborables a Saurí Rivera.

6. **Que el testimonio de Alejandra Torres Pérez (en adelante, "Torres Pérez"), al ser alumna de Saurí Rivera en su curso de educación física, constituye prueba directa**.

7. **Que el testimonio vertido por la estudiante Torres Pérez fue creíble y se le da entera credibilidad con relación a los tres cargos que la joven testificó, esto es los cargos 5, 6, y 7**.

. . . . . . . .

De conformidad con los enunciados fácticos citados, el TPI notificó la *Sentencia* aquí impugnada. En síntesis, concluyó que, partiendo de los cargos 5, 6, y 7 que la Árbitra Ríos Ramírez determinó probados, así como el convenio colectivo pactado entre las partes, era evidente que dichos cargos resultaban suficientes para confirmar la suspensión de empleo y sueldo por 120 días, tras el recurrido determinar que Saurí Rivera incurrió en conducta inmoral y lesiva al buen nombre del Departamento. Recalcó que "dichos cargos hacen referencia a una **conducta inapropiada de índole sexual por parte de un maestro a una estudiante, el cual ostenta un poder de autoridad sobre la parte afectada**".[11] (Énfasis nuestro).

En desacuerdo, la AMPR-LS acudió oportunamente ante nos y planteó los siguientes errores:

---

[11] Apéndice, pág. 549.

ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA AL REVOCAR EL LAUDO Y DETERMINAR QUE EL DICTAMEN DE LA ÁRBITRO DE LA CASP NO FUE CONFORME A DERECHO, CUANDO LOS HECHOS PROBADOS Y EL DERECHO APLICABLE NO JUSTIFICAN LA IMPOSICIÓN DE UNA SUSPENSIÓN DE EMPLEO Y SUELDO POR CIENTO VEINTE (120) DÍAS.

ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA AL REVOCAR EL LAUDO EMITIDO POR LA ARBITRO DE LA CASP MEDIANDO ARBITRERIARIDAD, ERROR MANIFIESTO Y ABUSÓ DE DISCRECIÓN EN SU DETERMINACIÓN.

## II.

## A.

El mecanismo para que el Tribunal de Apelaciones revise las sentencias finales dictadas por el Tribunal de Primera Instancia, referentes a revisiones de laudos de arbitraje, es el *certiorari. Hosp. del Maestro v. U.N.T.S.*, 151 DPR 934, 942 (2000); véase, Regla 32 (D) Reglamento del Tribunal de Apelaciones, 4 LPRA Ap. XXII-B. Este vehículo procesal permite a un tribunal de mayor jerarquía evaluar las determinaciones judiciales de un foro inferior, con el fin de corregir algún error cometido por éste. *800 Ponce de León v. AIG*, 205 DPR 163, 174 (2020); *IG Builders et al., v. BBVAPR*, 185 DPR 307, 337-338 (2012); *García v. Padró*, 165 DPR 324, 334 (2005).

Es sabido que este foro intermedio tiene la facultad para expedir o denegar el recurso de *certiorari* de manera discrecional. *García v. Padró, supra.* Claro está, el ejercicio de la discreción no equivale a hacer abstracción del resto del derecho, ya que ese proceder constituiría, en sí mismo, un abuso de discreción. *Negrón v. Srio. de Justicia*, 154 DPR 79, 91 (2001). Por lo tanto, el examen al auto discrecional que realizamos antes de decidir el curso a seguir no se da en el vacío ni en ausencia de otros parámetros. *800 Ponce de León v. AIG, supra,* pág. 176. Ello así, porque "el adecuado ejercicio de la discreción judicial está inexorable e indefectiblemente

atado al concepto de la razonabilidad". *García v. Padró, supra,* pág. 335; *Pueblo v. Ortega Santiago,* 125 DPR 203, 211 (1990).

Para ejercer sabia y prudentemente nuestra facultad discrecional al determinar si expedimos o denegamos un recurso de *certiorari,* nos guiamos por la Regla 40 del Reglamento del Tribunal de Apelaciones, *Criterios para la expedición del auto de Certiorari,* 4 LPRA Ap. XXII-B. Así reza:

> El Tribunal tomará en consideración los siguientes criterios al determinar la expedición de un auto de *certiorari* o de una orden de mostrar causa:
>
> (A) **Si el remedio y la disposición de la decisión recurrida, a diferencia de sus fundamentos, son contrarios a derecho**.
>
> (B) **Si la situación de hechos planteada es la más indicada para el análisis del problema**.
>
> (C) Si ha mediado prejuicio, parcialidad o error craso y manifiesto en la apreciación de la prueba por el Tribunal de Primera Instancia.
>
> (D) Si el asunto planteado exige consideración más detenida a la luz de los autos originales, los cuales deberán ser elevados, o de alegatos más elaborados.
>
> (E) Si la etapa del procedimiento en que se presenta el caso es la más propicia para su consideración.
>
> (F) Si la expedición del auto o de la orden de mostrar causa no causan un fraccionamiento indebido del pleito y una dilación indeseable en la solución final del litigio.
>
> (G) Si la expedición del auto o de la orden de mostrar causa evita un fracaso de la justicia. (Énfasis nuestro).

Es norma asentada que este tribunal intermedio no interviene con las determinaciones emitidas por el foro primario ni sustituye su criterio discrecional, "*salvo que se pruebe que dicho foro actuó con prejuicio o parcialidad, incurrió en craso abuso con el ejercicio de la discreción, o que incurrió en error manifiesto*". (Cursivas en el original). *Citibank et al. v. ACBI et al.,* 200 DPR 724, 736 (2018), que cita con aprobación a *Ramos Milano v. Wal-Mart,* 168 DPR 112, 121 (2006); *Rivera y otros v. Banco Popular,* 152 DPR 140, 155 (2000);

*Meléndez Vega v. Caribbean Int'l. News*, 151 DPR 649, 664 (2000); *Lluch v. España Service Sta.*, 117 DPR 729, 745 (1986).

**B.**

En nuestra jurisdicción, es norma firmemente asentada la vigorosa política pública que favorece el arbitraje obrero-patronal. *UGT v. Centro Médico del Turabo*, 208 DPR 944, 955 (2022), que cita a *AAA v. UIA*, 200 DPR 903, 922 (2018); *H.R., Inc. v. Vissepó & Diez Constr.*, 190 DPR 597, 605 (2014); *C.F.S.E. v. Unión de Médicos*, 170 DPR 443, 448 (2007). De ordinario el arbitraje obrero-patronal constituye un medio más apropiado que los tribunales para la solución de controversias que emanan de la relación contractual y laboral de las partes, ya que es más flexible y menos oneroso. *UGT v. Centro Médico del Turabo, supra*; *UGT v. Hima San Pablo Caguas*, 202 DPR 917, 928 (2019). Así, pues, una vez se somete la disputa laboral ante el árbitro, como parte de los acuerdos en un convenio colectivo, "se crea un foro sustituto a los tribunales de justicia". *UGT v. Centro Médico del Turabo, supra*; *HIETEL v. PRTC*, 182 DPR 451, 456 (2011).

Como se conoce, los procedimientos y los laudos de arbitraje en el campo laboral gozan de una especial deferencia ante los foros judiciales. *UGT v. Centro Médico del Turabo, supra*; *HIETEL v. PRTC, supra*. Ante esa deferencia, los únicos motivos por los cuales puede impugnarse exitosamente un laudo se reducen al: (1) fraude, (2) conducta impropia, (3) falta de debido procedimiento en la celebración de la vista, (4) **violación de la política pública**, (5) falta de jurisdicción, o (6) el hecho de que el laudo no resuelva todas las cuestiones que se sometieron al arbitraje. *UGT v. Centro Médico del Turabo, supra*, págs. 955-956; *Condado Plaza v. Asoc. Emp. Casinos P.R.*, 149 DPR 347, 353 (1999). Si no está presente alguna de estas consideraciones, se impone la autolimitación judicial. Véase, *Aquino*

*v. AEELA*, 182 DPR 1, 25 (2011); *C.F.S.E. v. Unión de Médicos, supra,* pág. 449.

Ahora bien, "**si las partes acuerdan que el laudo sea emitido conforme a derecho, los tribunales de justicia pueden corregir errores jurídicos de forma cónsona con el derecho aplicable**". *UGT v. Centro Médico del Turabo, supra*, pág. 956 y la jurisprudencia allí citada.

> [L]as determinaciones de hechos en laudos de arbitraje conforme a derecho pueden ser revisadas cuando no están sostenidas por evidencia sustancial en el expediente. Claro está, aun en estos casos, los tribunales de instancia no deben inclinarse a decretar la nulidad del fallo **a menos que efectivamente este no haya resuelto la controversia conforme a derecho**. Una mera discrepancia de criterio no justifica la intervención judicial, pues ello derrotaría los propósitos fundamentales del arbitraje. (Citas omitidas y énfasis nuestro). *Constructora Estelar v. Aut. Edif. Pub.*, 183 DPR 1, 33-34 (2011).

Es decir, ausentes las seis causas indicadas antes, **la doctrina de deferencia y autolimitación judicial ceden cuando el laudo tiene que emitirse conforme a derecho** y no ha sido resuelto en observancia al ordenamiento legal aplicable.

### III.

En esencia, la AMPR-LS y el señor Saurí Rivera imputan al TPI arbitrariedad, error manifiesto y abuso de discreción; y arguyen que incidió al revocar el *Laudo de Arbitraje* de la CASP por no ser conforme a derecho. Discutimos en conjunto los errores planteados.

Como cuestión de umbral, si bien las partes no acordaron un acuerdo de sumisión, tanto sus propuestas,[12] como la expresada por

---

[12] La AMPR-LS propuso:
1. Si la decisión de suspender de empleo y sueldo al profesor William C. Sauri Rivera, estuvo justificada, si se hizo conforme a derecho y se sostiene conforme a la prueba.
2. Si conforme a los hechos alegados, la prueba y el Derecho aplicable, la medida disciplinaria de suspensión de empleo y sueldo decretada contra el profesor William C. Sauri Rivera, es excesiva.
3. Que se revoque la suspensión de empleo y sueldo en contra del profesor William C. Sauri Rivera y se ordene el pago de todos los salarios, haberes, beneficios marginales, emolumentos y otros, dejados de recibir y correspondientes al periodo que el peticionario ha estado suspendido de empleo y sueldo, y se elimine la carta de suspensión de empleo y sueldo de su expediente de personal.

la CASP, establecieron palmariamente que **el laudo fuera resuelto conforme a derecho**. Esto significa que **el laudo tiene que considerar el derecho aplicable a la controversia**. Según esbozamos, cuando el laudo es conforme a derecho, la revisión del foro judicial atiende la corrección de errores jurídicos. En este caso, ciertamente, aun cuando en el *Laudo de Arbitraje* se aludió al ordenamiento legal aplicable, la CASP hizo total abstracción de su aplicación a la conducta impermisible del señor Saurí Rivera.

Conforme lo reseñado, la CASP halló probados los cargos 5, 6 y 7, por virtud de la total credibilidad conferida al testimonio de la exestudiante Torres Pérez. No obstante, coligió que el peticionario solamente incurrió en la ofensa 5 del Reglamento Núm. 7565, *supra*, que sanciona lo siguiente: **(a) conducta desordenada**, descrita como una "conducta desordenada o escandalosa que afecta la producción del servicio o la disciplina esperada en el área de trabajo"; o **(b) creación de disturbios**, que se refiere a la creación de "un disturbio que cause un efecto adverso en la moral, la producción del servicio o la disciplina esperada en el área de trabajo".[13] Por ende, al concebirla como excesiva, la CASP modificó la sanción original de suspensión de empleo y sueldo de 120 días a una amonestación escrita. La medida equivale a incurrir por tercera ocasión en el inciso (a) y por primera vez en el inciso (b). Además, se dispuso en la decisión arbitral, el pago de todos los haberes, sueldos y beneficios dejados de percibir desde el momento en que el señor Saurí Rivera fue suspendido.

---

4. Que el Laudo se emita conforme a Derecho.
El Departamento planteó:
1. Que la Honorable Árbitro determine si la suspensión impuesta al Querellante por el Departamento de Educación estuvo justificada, en virtud de la investigación realizada y de la prueba presentada.
2. De determinar que dicha suspensión estuvo justificada, que se confirme la acción disciplinaria impuesta por la Agencia.
3. Que se emita el laudo conforme a derecho.
Véase, Apéndice, págs. 13-14.
[13] Apéndice, pág. 494.

Sin embargo, de la determinación del Departamento se desprende que el recurrido imputó al señor Saurí Rivera una conducta **inmoral y lesiva al buen nombre del Departamento de Educación en el desempeño de las funciones**. De hecho, del expediente no surge por qué el Departamento no imputó la ofensa sexual 22 (a) del Reglamento Núm. 7565 ni observó el procedimiento establecido para ello, cuando es patente que la conducta exhibida por el peticionario en los cargos constituyó "[h]ostigar sexualmente a un menor o estudiante del Departamento de Educación".[14] Decididamente, los cargos 5, 6 y 7 probados no se limitaron a la ofensa 5 del Reglamento Núm. 7565, *supra*. Nótese que la reglamentación es diáfana al disponer en los Artículos VI y IX que las medidas correctivas y acciones disciplinarias para las distintas ofensas no permitidas presentadas en las tablas son meramente unas guías y **no representan un listado taxativo de las conductas no permitidas en el Departamento**. Al respecto, además del Reglamento Núm. 7565, *supra,* son de aplicación las bases legales y fuentes jurídicas de las que surge la reglamentación aludida, las cuales la Árbitra Ríos Ramírez desoyó.

Primero, la hoy derogada pero vigente a los hechos, Ley Núm. 149 de 15 de julio de 1949, *Ley Orgánica del Departamento de Educación de Puerto Rico*, 3 LPRA ant. sec. 143a *et seq.* En su Artículo 1.2, el estatuto disponía sobre las **tres premisas fundamentales del sistema educativo** de entronque constitucional. El segundo acápite establecía, en parte, que "[l]a **interacción entre estudiantes y maestros** constituye el quehacer principalísimo de la escuela". (Énfasis nuestro). 3 LPRA ant. sec. 143a (b). Por su parte, salvaguardando el debido proceso de ley de los docentes, el Artículo 4.13 del estatuto, 3 LPRA ant. sec. 144z,

---

[14] Apéndice, pág. 501, acápite 22 (a).

señalaba que "[e]l Secretario **podrá imponer sanciones disciplinarias a miembros del personal docente** y no docente **que infrinjan las leyes o los reglamentos** que gobiernan el Sistema de Educación Pública de Puerto Rico". (Énfasis nuestro). Acerca de las sanciones, la disposición apuntaba a que éstas podrían variar: por infracciones leves, se aplican meras reprimendas; y **por infracciones graves o severas, se pueden imponer las mayores sanciones como la destitución y la cancelación de certificaciones**. *Id.*

Segundo, es de aplicación al caso de marras la Ley Núm. 115 de 30 de junio de 1965, *Ley de la Junta de Apelaciones del Sistema de Educación*, 18 LPRA sec. 274 *et seq.* Observando el debido proceso, el <u>Artículo 1</u> de la legislación faculta al Secretario a "**cancelar el certificado de cualquier maestro permanentemente**" por observar "**conducta inmoral**" o "**desordenada, incorrecta o lesiva al buen nombre del sistema de educación** de Puerto Rico". (Énfasis nuestro). 18 LPRA sec. 274 (a)(g). De otro lado, el <u>Artículo 3</u>, Incisos (b) y (h), de la Ley 115 impone a los docentes el deber y la obligación de "**[o]bservar normas de comportamiento correcto**, cortés y respetuoso en sus relaciones con sus supervisores, compañeros de trabajo y ciudadanos"; y "**[c]umplir con las disposiciones de las leyes y reglamentos** aplicables al Departamento de Educación"; así como la prohibición de "**[o]bservar conducta incorrecta o lesiva al buen nombre del Departamento de Educación o al Gobierno de Puerto Rico**". (Énfasis nuestro). 18 LPRA sec. 274-2 (b)(h).

Además, destacamos que el <u>Artículo 2</u> de la Ley 115, 18 LPRA sec. 274-1 dispone:

> **Cuando la conducta de cualquier maestro** o empleado del sistema de educación pública **violare las normas establecidas**, por la ley o reglamento, **el Secretario de Educación <u>deberá</u> tomar las medidas correctivas necesarias**, siguiendo el procedimiento que aquí se

dispone. **Podrá considerar** la amonestación verbal, las reprimendas escritas, las suspensiones de empleo y sueldo, y **las destituciones**. [...]

**El Secretario de Educación podrá destituir** o suspender de empleo y sueldo cualquier maestro o empleado del sistema de educación pública **por justa causa y previa formulación de cargos por escrito, previa celebración de una vista administrativa informal**.

A los fines de esta ley **podrá ser motivo** de suspensión de empleo y sueldo o **de destitución**, entre otras situaciones similares, **la violación de las disposiciones contenidas en los Artículos 1 y 3** de esta ley. (Énfasis nuestro).

Asimismo, estas disposiciones se reiteran en el Reglamento Núm. 7565, *supra*, cuyo Artículo I, *Base Legal*, establece que se promulgó precisamente por virtud de las leyes anteriores. En particular, el Artículo IV, Sección 1, sobre los deberes y obligaciones mínimos de los empleados, dispone:

> .        .        .        .        .        .        .        .

> 2) **Observar normas de comportamiento correcto**, cortés y respetuoso **en sus relaciones con los estudiantes**, supervisores, compañeros de trabajo y ciudadanos en general.
> .        .        .        .        .        .        .        .

> 11) **Proteger los mejores intereses de los estudiantes** del sistema de educación pública guiado siempre por la normativa del Departamento de Educación.
> .        .        .        .        .        .        .        .

> 13) **Abstenerse de incurrir en cualquier conducta que afecte** o interrumpa **las labores** que se realizan en el centro de trabajo. (Énfasis nuestro).

Cabe señalar que, por las violaciones a las conductas proscritas, el Artículo III (6) del Reglamento Núm. 7565, *supra*, contempla la **destitución** como una "[a]cción disciplinara que conlleva la **separación total y absoluta del servicio impuesto a un empleado por la Autoridad Nominadora como acción disciplinaria por justa causa**, previa formulación de cargos y vista administrativa informal a solicitud del empleado. [...]".

Por último, es meritorio acudir al Convenio Colectivo suscrito entre el Departamento y la AMPR-LS,[15] toda vez que constituye la

---

[15] Apéndice, págs. 105-152.

ley entre las partes y al cual le aplican las disposiciones de la doctrina contractual del Código Civil. *HIETEL v. PRTC, supra,* pág. 458. El Artículo XVI, Sección 16.02, Inciso (10), del Convenio Colectivo establece una lista de las **faltas** que conllevan la imposición de **medidas disciplinarias**:

.        .        .        .        .        .        .        .

10. **El Departamento incorpora en este Convenio Colectivo la filosofía de aplicar medidas disciplinarias** progresivas y por **justa causa** de acuerdo a los hechos de **caso a caso** y tomando en consideración la **gravedad de los hechos imputados** al miembro de la Unidad Apropiada. **Constituirán causas de destitución**, suspensión de empleo y sueldo, amonestación o reprimenda, entre otras las siguientes faltas:

.        .        .        .        .        .        .        .

(c) **conducta inmoral**;

.        .        .        .        .        .        .        .

(i) Observancia de una **conducta desordenada, incorrecta o lesiva al buen nombre del Sistema de Educación Pública de Puerto Rico**.

.        .        .        .        .        .        .        .

(p) No cumplir con los siguientes deberes y obligaciones:

.        .        .        .        .        .        .        .

(2) **Observar normas de comportamiento correcto**, cortés y respetuoso en sus relaciones con sus supervisores, compañeros de trabajo y ciudadanos.

.        .        .        .        .        .        .        .

(5) **Cumplir con las disposiciones de las leyes y reglamentos aplicables al Departamento de Educación** y con las órdenes emitidas de conformidad con las mismas. (Énfasis nuestro).

.        .        .        .        .        .        .        .

En cuanto a los procedimientos, el Inciso (13) de la precitada Sección 16.02 dispone que "**no aplicarán en forma estricta las reglas de evidencia**, pero el oficial examinador podrá utilizarlas con el **propósito de que aflore la verdad y que se haga justicia sustantiva**". (Énfasis nuestro). En armonía, en nuestra jurisdicción, "[e]l carácter informal y flexible, que distingue a los procesos administrativos, permite que el juzgador de hechos conozca toda la información pertinente para dilucidar la controversia que tiene ante

sí", por lo que es plausible la admisión de prueba de referencia. *Otero v. Toyota*, 163 DPR 716, 733 (2005).

La prueba de referencia se refiere a una declaración hecha fuera de la vista que se presenta para probar la verdad de lo aseverado. Regla 801 (c) de las Reglas de Evidencia, 32 LPRA Ap. VI, R. 801(c). Como norma general, la prueba de referencia es excluida por su falta de confiabilidad y valor probatorio. *In re Ríos Ríos*, 175 DPR 57, 75 (2008). Por ello, al evaluar la admisibilidad de prueba de referencia, se deben considerar varios factores: (1) que no se lesione significativamente el derecho a confrontación de la parte contra la cual se admite; (2) el elemento de necesidad, en lo que respecta a que el declarante no está disponible para testificar en el juicio o vista en que se ofrezca la prueba, y (3) **las garantías circunstanciales de confiabilidad que pueda tener la declaración**. E.L. Chiesa, *Tratado de Derecho Probatorio*, Estados Unidos de Norte América, Publicaciones JTS, 2005, Tomo II, pág. 565.

A esos efectos, el Tribunal Supremo de Puerto Rico, al citar con aprobación el precedente federal *Richardson v. Perales*, 402 US 389 (1971), resolvió que una "agencia puede descansar su determinación sólo en prueba de referencia, aun cuando ésta sea contradicha por prueba, si la prueba de referencia es del tipo que un hombre prudente y razonable descansa en ella para llevar a cabo sus negocios". *Otero v. Toyota, supra*, págs. 733-734; reiterado en *Torres Santiago v. Depto. Justicia*, 181 DPR 969, 1005 (2011). Así, compete evaluar los criterios de admisibilidad aludidos para garantizar el valor probatorio y la confiabilidad de la prueba de referencia. Igualmente, es menester considerar que nuestro alto foro ha refrendado que las agencias admitan este tipo de prueba cuando la decisión se sostenga también por la prueba documental y testifical desfilada. *Otero v. Toyota, supra*, págs. 734-735.

Lo anterior es de particular importancia, porque en este caso, se desestimaron los cargos 1 y 2 al descartar prueba de referencia en el expediente que, a nuestro juicio, era confiable, en alusión a varias declaraciones manuscritas de otras dos estudiantes, emitidas coetáneas a los hechos, en el contexto de una investigación del Departamento.[16] Dichas expresiones podían ser corroboradas por la participación directa de la trabajadora social, Sra. Gerlyn Serrano Cruet, y de la investigadora, Sra. Daphne Rivera Barreto, en los nefastos incidentes que allí se narran.

Por otra parte, con relación a la trilogía de cargos probados contra el señor Saurí Rivera, el maestro de Educación Física de nivel secundario se condujo de una forma inapropiada y sostuvo conversaciones de índole sexual en perjuicio de la exestudiante Torres Pérez, cuando ésta era menor de edad. Por ejemplo, en el cargo 5, el señor Saurí Rivera hizo comentarios tales como, "que un día fuera para su casa por la noche"; "que con esa pose hubiese sido bueno tener el celular afuera y tirarle una foto". En cierta ocasión en que la joven corrió a buscar una bola, el peticionario le dijo: "[C]orre, así mismo, que se te mueve todo, así te quiero ver". Por igual, en el cargo 6, cuando la joven inquirió sobre el lugar de una práctica deportiva, el peticionario le respondió que "ella no sabría, ya que no había ningún motel cerca". Por último, en el cargo 7, a sabiendas de la minoridad de la exestudiante Torres Pérez, porque él mismo le preguntó la edad, el señor Saurí Rivera le tocó el hombro y le dijo que, "como era flaca" él "la aguantaría fácil". Luego, hizo avances físicos y "le acercó el rostro". Cuando la joven lo evitó, el peticionario cuestionó "por qué se echó para atrás".

En este caso, tal como determinó el Departamento en su comunicación de 14 de diciembre de 2018, en el desempeño de sus

---

[16] Refiérase al Apéndice, págs. 251-262; 345-348; 362-366.

funciones magisteriales, la conducta reiterada del señor Saurí Rivera resultó en una inmoral y lesiva al buen nombre del recurrido. Peor aún, el peticionario transgredió un pilar del sistema educativo del país mediante su desordenada e incorrecta interacción con la exestudiante Torres Pérez. En estas instancias, era deber y obligación del Departamento tomar las medidas correctivas necesarias. Claro, cónsono con el ordenamiento legal esbozado, previo a la imposición de cualquier sanción, era una condición *sine qua non* observar un debido proceso de ley por el interés propietario del peticionario sobre su plaza permanente.

En torno a esto, como reseñamos, al señor Saurí Rivera se le cursó una misiva de intención de formular cargos el 24 de julio de 2017, por lo que un Oficial Examinador presidió la vista administrativa informal, celebrada el 24 de octubre de 2018, y rindió el documento intitulado *Resolución y Recomendaciones*.[17] Entonces, el Departamento formuló los cargos finales el 14 de diciembre de 2018 y aplicó una sanción disciplinaria, consistente en una suspensión de empleo y sueldo por 120 días. Posteriormente, el peticionario impugnó la determinación ante la CASP, que emitió el *Laudo de Arbitraje* en controversia. Ello así, evidentemente se salvaguardó el debido proceso de ley del señor Saurí Rivera.

Ahora bien, al conciliar los hechos probados y consignados en los cargos 5, 6 y 7 con los fundamentos legales, reglamentarios y contractuales atinentes, somos del criterio que las medidas disciplinarias impuestas por el Departamento y por la CASP no son cónsonas con la seriedad de la conducta reiterada del recurrido. Por tanto, colegimos que el TPI acertó al determinar que la CASP no resolvió la controversia ante sí de conformidad al derecho aplicable. Claramente, la Árbitra Ríos Ramírez de la CASP, en violación a la

---

[17] Apéndice, págs. 460-470.

política pública del Departamento, minimizó los ominosos incidentes e hizo caso omiso a fundamentos legales invocados por el recurrido, vigentes a los hechos y pertinentes al comportamiento imputado contra el señor Saurí Rivera. Consecuentemente, la deferencia al *Laudo de Arbitraje* cede y se impone la intervención judicial. A tales efectos, acordamos modificar la reinstalación de la suspensión de empleo y sueldo por 120 días a una destitución, junto con la cancelación de las certificaciones magisteriales. Esta medida disciplinaria cumple cabalmente con el ordenamiento legal, reglamentario y contractual. Además, la destitución y la cancelación de certificaciones resulta en una sanción proporcional, al tomar en consideración la gravedad de la repetitiva conducta incorrecta, inmoral y lesiva de índole sexual exhibida por el peticionario, quien ostentaba poder de autoridad sobre la exestudiante Torres Pérez, ya que la materia impartida por éste era un requisito de graduación.

**IV.**

Por los fundamentos expuestos, expedimos la petición de *certiorari* y modificamos la *Sentencia* apelada, a los efectos de destituir al señor William C. Saurí Rivera del puesto permanente R85135 y revocar cualquier tipo de certificado, permiso o autorización que ostente o haya ostentado como empleado del Departamento de Educación. Así modificada, se confirma.

Lo acordó y manda el Tribunal, y lo certifica la secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones